GMP:FJN/ALK
F. #2018R02303

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

                                                    No. 19–CR–004 (WFK)

    - against -

MOLISSA GANGAPERSAD,

              Defendant.

– – – – – – – – – – – – – – – – – –X

MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S MOTIONS IN LIMINE

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Francisco J. Navarro
Anna L. Karamigios
Assistant United States Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motions in limine in anticipation of trial, which is scheduled to begin on July 20, 2020. The defendant, Molissa Gangapersad, is charged with making false statements to federal agents, in violation of Title 18, United States Code, Section 1001. The government respectfully requests that the Court preclude the defendant from mentioning at trial, during jury addresses, cross-examination or otherwise, the following:

- any consequences the defendant may face upon conviction, whether penal or collateral;
- any alleged domestic violence incidents involving the defendant; and
- the defendant's lack of criminal history or criminal records (unless the defendant testifies).

For the reasons set forth herein, the government's motions in limine should be granted.

BACKGROUND

The government expects to establish the following facts at trial.[1]

A.  Ronell Watson Shoots an On-Duty FBI Agent Without Provocation

On December 8, 2018, FBI Special Agent Christopher Harper was on duty in Canarsie in Brooklyn, New York. Agent Harper was parked in an unmarked Nissan Maxima near 1626 Canarsie Road, which is a one-way street. As Agent Harper sat in his parked car,

---

[1] The proffer of facts set forth herein is not a complete statement of all facts and evidence of which the government is aware or will seek to introduce at trial.

a dark-colored BMW M5 sedan driven by the defendant's boyfriend, Ronell Watson ("Watson"), approached, driving down Canarsie Road in the wrong direction.

Watson parked his BMW near the front of Agent Harper's car, partially obstructing Agent Harper's ability to drive forward.  Watson then exited the BMW and approached Agent Harper's driver-side door with one hand inside the front pocket of his hooded sweatshirt.  Agent Harper then began to maneuver his car around the BMW to escape.  As Agent Harper attempted to drive away, Watson pulled out a firearm and shot Agent Harper in the back with one round.  Watson also hit Agent Harper's car from behind with multiple rounds.  Agent Harper then got out of his car, drew his service weapon, and returned fire at Watson.  Agent Harper fired multiple rounds at Watson's BMW and hit Watson's hand with one round.  Watson then fled the scene in his bullet-riddled BMW and drove to an auto body shop located on Remsen Avenue in Brooklyn, where he disposed of the vehicle.  Watson then sought treatment for the bullet wound to his hand at a nearby hospital, where the FBI subsequently arrested him.[2]

      B.      The FBI Obtains Video of the Shooting and Defendant Witnessing the Shooting

Shortly after the shooting, law enforcement officers responded to the shooting scene and canvassed for evidence.  The officers noticed video cameras located at 1626 Canarsie Road that were in a position to have captured the shooting.  FBI agents went to the

---

[2] For his conduct, a jury convicted Watson on July 17, 2019, of: (1) Attempted Murder of a Federal Officer, in violation of 18 U.S.C. § 1114(3); (2) Assault of a Federal Officer, in violation of 18 U.S.C. §§ 111(a)(1) and 111(b); and (3) Possessing and Discharging a Firearm During a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (c)(1)(A)(iii).

first-floor door of 1626 Canarsie Road and identified themselves to the owners. The owners initially identified Watson as their tenant and indicated that he lived in the second-floor apartment. The owners then invited the agents into 1626 Canarsie Road and provided them with access to their video recording system.[3]

### C.  FBI Agents Interview Defendant

As part of the investigation, at approximately 9 p.m., FBI agents went to the apartment the defendant shared with Watson, which was located on the second floor of 1626 Canarsie Road. The agents knocked on the door, identified themselves, and the defendant invited them in. The defendant then sat at her kitchen table and spoke to two FBI agents.

At the outset of the interview, the FBI agents informed the defendant that it was a federal felony to provide false information to a federal agent. The FBI agents then inquired about the shooting. The defendant stated in substance and in part that she had been in her apartment when she heard gunshots coming from outside. She further stated that when she walked outside to see what was happening, she saw police cars on the block and someone told her that an officer had been shot in the shoulder. The defendant told the FBI agents that she did not see what happened, and did not know about Watson's involvement in the shooting until she learned about it from a police officer. The defendant also told the FBI agents that Watson had been a member of the Crips street gang for as long as she had known him (almost ten years). The defendant further stated that Watson had pointed a gun at her during a domestic dispute in 2011 or 2012, but that she had not seen Watson with a gun since

---

[3]  At the time, the FBI agents were not aware that the downstairs neighbors, the owners of the home, were Watson's parents.

3

that incident. During the interview, the FBI agents asked the defendant for permission to search the home. The defendant declined to give consent. FBI agents continued to interview the defendant in her kitchen while other agents simultaneously worked with the U.S. Attorney's Office to obtain a search warrant for the home.[4]

At approximately 12:00 a.m., on December 9, 2018, the interviewing agents were notified that the FBI had obtained video evidence of the shooting. The interviewing agents learned from the videos that the defendant had been on her front porch on her cellular telephone at the time of the shooting. Her positioning and actions demonstrated that she had viewed the incident. The agents then asked the defendant—who was seated in her kitchen while the search warrant was executed—to come with them to the downstairs apartment to view videos of the shooting. The agents also seized the defendant's cellular telephone pending an application for a search warrant for the device.[5] As the FBI agents escorted the defendant to the room where she could watch the videos, one agent told the defendant that a video she was about to see showed her witnessing the shooting. The defendant maintained that she was not a witness to the incident. The FBI agents then showed the defendant video footage from multiple cameras, including a video of the defendant watching the shooting from the front porch of 1626 Canarsie Road.

---

[4] The Honorable Arlene R. Lindsay, United States Magistrate Judge for the Eastern District of New York authorized a warrant to search the residence for evidence related to the shooting at approximately 11:27 p.m.

[5] The FBI agents seized the telephone after seeing the surveillance video of the defendant using the device while witnessing the shooting. The Honorable Steven L. Tiscione, United States Magistrate Judge for the Eastern District of New York subsequently authorized a search of the defendant's telephone for evidence related to the shooting.

After viewing the videos, the defendant stated, among other things, that Watson was present at the scene of the shooting, that Watson aggressively approached Agent Harper's car, and that she heard gun shots shortly after Agent Harper drove away. The defendant also stated that she had been in telephone contact with Watson immediately before and after the shooting. The defendant also admitted that she had lied to the FBI agents earlier in the interview when she said she had not witnessed the shooting. Shortly thereafter, the defendant invoked her right to counsel and the FBI agents terminated the interview.

## ARGUMENT

A. <u>Evidence and Argument Concerning the Defendant's Possible Punishment Should be Precluded</u>

The Court should preclude the defendant from referencing at trial any consequences of her conviction. The defendant faces a statutory maximum sentence of five years' imprisonment if she is convicted at trial. While the defense has not suggested that it intends to introduce any discussion of this fact at trial, out of an abundance of caution, the government moves to preclude at trial any discussion of the defendant's possible punishment or collateral consequences of conviction.

Evidence regarding possible consequences the defendant may face if convicted should be precluded because it is not relevant. Pursuant to Rule 401 of the Federal Rules of Evidence ("FRE"), "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Generally, relevant evidence is admissible and "[i]rrelevant evidence is not admissible." <u>See</u> FRE 402. "[T]he district court has broad discretion to exclude evidence that is irrelevant . . . ." <u>United States v. Edwards</u>, 631 F.2d 1049, 1051 (2d

5

Cir. 1980); see also FRE 403.  The defendant's punishment is not a "fact[] of consequence" to be determined at trial.  Therefore, any evidence of that issue is not relevant.  See Shannon v. United States, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task.").

Such evidence is not only irrelevant, but "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."  Id.  Indeed, Courts routinely instruct jurors not to consider a defendant's punishment in determining a defendant's guilt.  See generally Sand et al., Modern Federal Jury Instructions, Instruction 9-1 (2017 ed.); see also Shannon, 512 U.S. at 579 (a jury "should be admonished to reach its verdict without regard to what sentence might be imposed [and] not to consider the consequences of their verdicts . . . ." (internal citation omitted)); United States v. Watts, 934 F. Supp. 2d 451, 464-65 (E.D.N.Y. 2013) ("[I]t is well-established precedent that jurors should not be informed about the possible consequences of their verdict due to the likelihood that prejudice, unfairness, and confusion that would result.").

Courts have repeatedly precluded evidence of the potential sentences defendants face because such evidence is irrelevant, unfairly prejudicial and outside the province of the jury.  See, e.g., United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997) (holding that district court correctly refused to permit defendant to argue about the severity of his possible punishment); United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996) (district court "soundly excluded" evidence of a potentially harsh sentence because such evidence "would have necessitated an unwarranted departure from the fundamental division

of responsibilities between judge and jury."); United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences."). In short, guilt should determine punishment, not the other way around. See United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court . . . . We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that the courts may permit it to occur when it is within their authority to prevent."). Courts have consistently recognized that juries have no right to nullify, and "trial courts have the duty to forestall or prevent such conduct." Id. at 616. Therefore, the Court should preclude the defendant from referencing her potential punishment or collateral consequences of conviction at trial.[6]

        B.        The Court Should Preclude the Defendant From Arguing Duress or Referencing Domestic Violence

The Court should also preclude the defendant from referencing any alleged domestic violence incidents between her and Watson at trial.[7] Again, the defense has not suggested that it intends to introduce any discussion of these alleged incidents at trial. Out of

---

[6] Nevertheless, to the extent that the defendant exercises her right to testify, the government should be permitted to cross-examine her regarding the potential consequences of conviction that she faces because, then, it is relevant to the defendant's credibility as a witness. See Davis v. Alaska, 415 U.S. 308, 316 (1974) (discussing use of cross-examination to reveal "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues . . . in the case at hand. The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." (internal quotation omitted)).

[7] The government does not take a position on the credibility of the domestic violence allegations.

7

an abundance of caution, the government moves to preclude at trial any discussion of past domestic violence incidents.

Evidence regarding alleged domestic violence incidents between the defendant and Watson should be precluded as irrelevant. The defendant's alleged history with Watson is not a "fact[] of consequence" to be determined at trial. Therefore, any evidence of that history is not relevant. To the extent that the defendant wishes to introduce any alleged domestic violence incidents to the jury to excuse (or explain) why she lied to the FBI agents, the Court should preclude such evidence because it does not meet the threshold for duress.

"The affirmative defense of duress excuses criminal conduct committed under circumstances from which a jury may infer that the defendant's hand was not guided by evil intent, but by the imminent threat of grievous bodily harm." United States v. Zayac, 765 F.3d 112, 120 (2d Cir. 2014). In order to obtain a jury instruction on the defense, a defendant must make "some showing on each" of three elements: "(1) [s]he faced a threat of force, (2) sufficient to induce a well-founded fear of impending death or serious bodily injury, and (3) [s]he lacked a reasonable opportunity to escape harm other than by engaging in the illegal activity." 765 F.3d at 120 (internal quotation marks and citation omitted).

Here, the defendant will not be able to meet the legal standard for duress because at the time she committed the crime (i.e. lied to the FBI agents), she was not facing a threat of force, much less one sufficient to induce a well-founded fear of impending death or serious bodily injury. To the contrary, at the time she made her false statements, the defendant was safely in her own home with law enforcement officers who would protect her. Moreover, the defendant knew that Watson was at the hospital with other law enforcement

8

officers.[8]  In short, the defendant was in no danger of harm, much less the impending harm necessary to raise a duress defense.  Zayac, 765 F.3d at 120.

In that context, statements about past domestic violence incidents are irrelevant and improperly invite jurors to consider a duress defense.  The jury's consideration of a precluded defense would be tantamount to nullification, which "trial courts have the duty to forestall or prevent."  Thomas, 116 F.3d at 614.  Therefore, the Court should preclude the defendant from referencing any alleged domestic violence incidents at trial.

### C. The Defendant Should be Precluded From Raising Her Lack of Criminal History

The Federal Rules of Evidence ordinarily prohibit witnesses from proving good character through specific instances of conduct.  See FRE 405(a).  However, the Second Circuit has concluded that evidence of a lack of prior convictions or arrests is admissible for the purpose of gauging the credibility of a testifying defendant.  See United States v. Blackwell, 853 F.2d 86, 88 (2d Cir. 1988) (noting the "relatively low probative value" of this evidence).  Thus, such evidence becomes relevant and admissible if – and only if – the defendant testifies, and even then for the very limited purpose of providing background information relating to her credibility as a witness.

Consistent with Blackwell, the government requests that the Court preclude the defendant from informing the jury of her lack of criminal history, unless and until she chooses to testify.  Likewise, the Court should prohibit defense counsel from advising the jury of the defendant's lack of criminal history in opening statements, through cross-

---

[8]  Watson had telephoned the defendant from the hospital in the presence of law enforcement officers and told her his whereabouts.

9

examination of government witnesses, or direct examination of defense witnesses, unless that witness is the defendant herself. Counsel also should not be able to use the absence of a prior criminal record, or any other evidence of specific instances of conduct, to prove good character, or to show lack of intent or motive. To allow otherwise would confuse the issues under consideration, in violation of Federal Rule of Evidence 403, and violate Federal Rule of Evidence 405(b)'s restrictions against proving good character through specific instances of conduct.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court grant the government's motions in limine and preclude the defendant from mentioning at trial, during jury addresses, cross-examination or otherwise, any consequences the defendant may face upon conviction, whether penal or collateral, any reference to any domestic violence incidents involving Watson and the defendant, and the defendant's lack of criminal history or criminal records (unless the defendant testifies).

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By: /s/   Francisco J. Navarro
Francisco J. Navarro
Anna L. Karamigios
Assistant United States Attorneys
(718) 254-7000

cc:   Gary Schoer, Esq. (by ECF)
      Clerk of Court (WFK) (by ECF)